1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

11

12

13

14

15

16

17

| | |
|---|---|
| **DEBRA MORUZZI,** ) | |
| ) | |
| **Plaintiff,** ) | **Case  No. EDCV 09-00729 AJW** |
| ) | |
| **v.** ) | **MEMORANDUM OF DECISION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

18

19

20

21

        Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the

Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance

benefits and supplemental security income benefits.  The parties have filed a Joint Stipulation ("JS") setting

forth their contentions with respect to each disputed issue.

22

**Administrative Proceedings**

23

24

25

26

27

28

         Plaintiff alleges that she became disabled on September 29, 2006 due to major depressive disorder,

severe; anxiety; hypothyroidism; arthritis; osteoarthritis of the right foot; bone spurs; fatigue; chronic pain;

and obesity. [JS 2; Administrative Record ("AR") 6]. In a December 2008 written hearing decision that

constitutes the Commissioner's final decision in this matter, an administrative law judge ("ALJ") concluded

that plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform jobs

existing in significant numbers in the national economy. [JS 2; AR 6-12].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision.  Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Treating psychiatrist**

Plaintiff contends that the ALJ erred in disregarding the opinion of her treating psychiatrist, Jesse R. Devera, M.D. [See JS 3-9].

Where the opinion of a treating or examining physician is uncontroverted, the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting it. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-49 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

The record indicates that plaintiff began seeing Dr. Devera at Lucerne Valley Counseling, a San Bernardino County Department of Behavioral Health ("County Behavioral Health") clinic, in May 2005. Her diagnosis was major depressive disorder, recurrent, severe, without psychotic features. Dr. Devera prescribed antidepressant medications, including Lexapro and Cymbalta. [AR 37-38, 229-234, 255-266, 269-276, 374-384, 425-448].

1    In June 2005, shortly after she started seeing Dr. Devera, plaintiff went to Arrowhead Regional

2  Medical Center ("ARMC") "with suicidal ideas, impaired judgment, hopelessness, anxiety, and irritability."

3  [AR 320; see AR 316-337]. She told the attending physician that she was overwhelmed with depression

4  related to her responsibilities as the adoptive parent of her 3- and 5-year-old grandchildren, the children of

5  her drug-addicted daughter, and as the caretaker of another adult daughter, who was brain-injured and

6  wheelchair-bound. [AR 327-329, 332].  Plaintiff was deemed a danger to herself or others and was

7  involuntarily admitted to ARMC for five days of inpatient care. [AR 9, 327-337, 380].

8    Plaintiff's discharge summary states that her diagnosis was major depressive disorder, recurrent,

9  severe.  The attending physician stated that her mood had been stabilized with medications, and she also

10  had been treated for symptomatic allergies and a urinary tract infection.  Plaintiff had participated in group

11  therapy and "did well" with it.  She was discharged in "improved" condition, without suicidal ideation or

12  psychosis. She was prescribed Lexapro, Klonopin, Wellbutrin, and Seroquel for her psychiatric condition

13  and was instructed to follow up at a County Behavioral Health clinic [AR 320-321].

14    In July 2005, plaintiff resumed monthly medication visits with Dr. Devera, and she continued to see

15  him monthly until December 2007. [See AR 37-38, 229-234, 255-266, 269-276, 374-384, 425-448]. In

16  December 2007, Dr. Devera completed a "Work Capacity Evaluation (Mental)" checklist form indicating

17  that plaintiff had "moderate" or "marked" limitations in all of the work-related mental functional abilities

18  listed on the form. [AR 419-420].

19    The record contains no evidence of mental health treatment between December 2007 and September

20  2008, when plaintiff went to another County Behavioral Health clinic complaining of anxiety and

21  depression. Plaintiff was examined by Romeo Villar, M.D., who diagnosed major depression and prescribed

22  medications.  On an intake assessment from the same facility, it was noted that plaintiff reported often using

23  marijuana and having occasionally used speed, most recently more than a year earlier. [AR 450-458].

24    The ALJ found that plaintiff had severe impairments consisting of major depressive disorder,

25  recurrent, without psychotic symptoms; generalized anxiety disorder; history of cannabis abuse disorder;

26  history of polysubstance abuse and dependence, in remission; moderate to marked right foot osteoarthritis;

27  obesity with compensated hypothyroidism; and history of generalized joint pain. [AR 8].   The ALJ noted

28  that plaintiff had a long history of severe anxiety and depression. [AR 9]. The ALJ added that plaintiff was

given a Global Assessment of Function ("GAF") score of 25 when she was admitted for psychiatric hospitalization, and that her GAF score on discharge was 45.[1] The ALJ remarked that plaintiff had received a GAF score of 45 when she started treatment in May 2005, and that she also received a GAF score of 45 in June 2006.  [AR 9, 321-332, 383-385]. The ALJ concluded that plaintiff's condition had not changed significantly between her discharge from ARMC and December 2007, when she stopped seeing Dr. Devera. The ALJ characterized plaintiff's treatment as "conservative," noting that there had been no indication of any change in her medication.  The ALJ pointed out that plaintiff received a GAF score of 60, indicative of moderate symptoms or a moderate functional impairment, on September 16, 2008,[2] and that her examination findings on that date were within normal limits.  [AR 9, 453]. See note 1, supra.

The ALJ reasoned that "[g]iven the lack of change in the clinical findings since shortly after the hospitalization in 200[5][3] and the recent admissions regarding at least occasional amphetamine abuse prior to 2008, I must discount the assessment of [Dr. Devera] . . . and give greater weight to [Dr. Villar's]

---

[1]      The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological *symptoms,* or the patient's psychological, social, and occupational *functioning*.  The GAF score is the lower of the symptom severity score or the functioning severity score.  A GAF score of 21 through 30 means that delusions or hallucinations considerably influence the individual's behavior, a serious impairment in communication or judgment exists (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or the individual is unable to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). A score of 41 through 50 denotes serious symptoms, such as suicidal ideation or severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as the absence of friends or the inability to keep a job. A score of 51 through 60 signifies moderate symptoms, such as flat affect or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or co-workers. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Multiaxial Assessment, 27-36 (rev. 2000)); see also Morgan, 169 F.3d at 598 n.1 ("Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient."); Sousa v. Chater, 945 F.Supp. 1312, 1319 n.7, 1320 n.8, 1322 n.9 (E.D. Cal. 1996)(discussing the significance of GAF scores), rev'd on other grounds,143 F.3d 1240, 1245 (9th Cir. 1998).

[2]      The ALJ appears to have misstated this date as September 16, 2006 and to have cited the wrong exhibit, but from the context, it is clear he was referring to Dr. Villar's September 16, 2008 examination report at AR 452-453.

[3]      The ALJ said "2006," but from his prior discussion, it appears that he was referring to plaintiff's June 2005 hospitalization.  The record does not contain any evidence of a 2006 hospitalization.

1  assessment, which is more consistent with the detailed assessment and findings of" the medical expert, Dr.

2  Glassmire. [AR 9 (footnote added)].

3          The ALJ's stated reasons for rejecting Dr. Devera's opinion are not legitimate. The ALJ emphasized

4  that plaintiff's treating GAF score had remained stable at 45 during much of the period she was undergoing

5  treatment with Dr. Devera, other than during her episode of decompensation in June 2005, and that her

6  clinical findings did not significantly change during that period. The ALJ also noted that plaintiff's

7  treatment was "conservative in that it involved monthly medications visits with no indication of any change

8  in her medications." [AR 9].

9          By the ALJ's own logic, plaintiff's stable GAF score of 45 means that she exhibited serious

10  symptoms or a serious functional impairment despite seeing Dr. Devera on a monthly basis for about

11  eighteen months and taking psychotropic medication.  As the ALJ also noted, plaintiff's clinical findings

12  did not change significantly during that time.  In 2006 and 2007, after months of treatment with Dr. Devera,

13  plaintiff continued to exhibit abnormalities on her mental status examination, such as limited insight, sad

14  affect, and depressed mood, despite "good" medication compliance. [E.g., AR 374-376, 432-433].  Although

15  Dr. Devera noted some improvement in her symptoms at times, his notes do not reflect consistent or

16  sustained improvement.

17          The ALJ also buttressed his rejection of Dr. Devera's opinion by asserting that plaintiff's clinical

18  findings were within normal limits on September 16, 2006. [AR 9].   That is incorrect; there is no

19  examination report bearing that date.  It appears that the ALJ was referring to a September 16, *2008* report

20  from Dr. Villar, who indicated that plaintiff's mental status examination findings were within normal limits.

21  Dr. Villar diagnosed major depression, recurrent, without psychosis.   He gave plaintiff a GAF score of 60,

22  signifying moderate symptoms or a moderate functional impairment. [AR 453]. See note 1, supra. Plaintiff,

23  however, alleges that she became disabled two years earlier, in September *2006*, when the record

24  consistently shows that she was still exhibiting signs and symptoms of major depression.  Thus, Dr. Villar's

25  September 2008 report, which reflected his initial evaluation of plaintiff, does not contradict Dr. Devera's

26  prior assessments, which were based on a longitudinal psychiatric treatment relationship of 18 months'

27  duration that involved frequent examinations. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)(stating that

28  the length, nature, and extent of a treatment relationship and the frequency of examinations are factors

1  affecting the weight given a medical opinion).

2  It also bears noting that a week before plaintiff saw Dr. Villar, she underwent an initial clinical

3  assessment that was signed by two County Behavioral Health clinicians, neither of whom was a licensed

4  physician or psychologist. [See AR 454-458].  Those clinicians reported several abnormal mental status

5  findings, including a somewhat disheveled appearance; rapid, anxious speech; impaired recall; ruminating

6  thought process; fair insight; impaired judgment; and depressive mood.   [AR 454].  They gave plaintiff a

7  GAF score of 50, which is in the same range (41 through 50) as her prior GAF scores of 45 and denotes

8  serious symptoms or a serious functional impairment. [AR 454]. See note 1, supra.

9  Because neither clinician was an acceptable medical source, the ALJ was entitled to credit Dr.

10  Villar's benign examination findings and GAF score of 60.   However, the ALJ selectively credited *other*

11  aspects of the clinicians' assessment  that were unfavorable to plaintiff, even when their assessment was

12  inconsistent with evidence from an acceptable medical source. Specifically, the clinicians gave plaintiff

13  diagnoses of mood disorder not otherwise specified, active cannabis dependence, and polysubstance

14  dependence, in remission by client report. [AR 458].  Dr. Villar diagnosed major depression but made no

15  diagnosis of substance abuse of any kind.  After examining plaintiff, Dr. Glassmire, the medical expert,

16  testified that her diagnoses were major depressive disorder, severe, without psychotic features; generalized

17  anxiety disorder; a six-month history of cannabis abuse; and no credible evidence of amphetamine or

18  polysubstance abuse.[4] [AR 30, 33-34].

19  Citing the reports of Dr. Villar and Dr. Glassmire, the ALJ found that plaintiff had severe,

20  nondisabling mental impairments consisting of major depressive disorder, generalized anxiety disorder,

21  history of cannabis abuse, and a history of polysubstance abuse and dependence in remission. [AR 8-9].

22  The ALJ did not acknowledge that the only diagnosis of history of polysubstance abuse appeared in the

23

24  [4]    In response to Dr. Glassmire's questions, plaintiff denied that she had reported using any
drug other than marijuana and stated that she did not understand the diagnosis of polysubstance
25  abuse. [AR 29-30]. Plaintiff testified that she had used marijuana about once or twice a week for
about six months, and that her last use was about a month prior to the hearing. [AR 26-28].  Dr.
26  Glassmire said that "looking at the longitudinal record I don't see evidence of anything other than
the cannabis abuse during the six-month period that she testified to today, so I just want to state that
27  for the record, that that doesn't seem to be supported by the record or her testimony today, which
I find credible on that." [AR 33-34].
28

1  clinicians' controverted report, which the ALJ ignored in other respects that tended to undermine his

2  findings.

3      The ALJ erred in selectively adopting the diagnosis of polysubstance abuse and dependence in

4  remission, which was controverted by the opinions of two acceptable medical sources.  The ALJ

5  compounded that error by assuming that plaintiff's purported amphetamine abuse made Dr. Devera's

6  treating source opinion less trustworthy.  Accordingly, the ALJ's assessment of the medical opinion

7  evidence is not based on substantial evidence and does not comport with the governing legal standards.

8          **Nonexamining state agency physicians**

9      Plaintiff contends that the ALJ erred in failing to discuss the opinion of the nonexamining state

10 agency physician, Dr. Gregg.  Plaintiff argues that the ALJ impermissibly ignored a "degree of consistency"

11 between Dr. Gregg's opinion that plaintiff had several "moderate" mental functional limitations [AR 338-

12 339] and Dr. Devera's findings.  [JS 10; see JS 9-12].

13     The ALJ erred in failing to mention, or give reasons for rejecting, Dr. Gregg's opinion.  See Shafer

14 v. Astrue, 518 F.3d 1067, 1069-1070 (9th Cir. 2008) (noting that an ALJ's silent disregard of a

15 nonexamining physician's opinion "contravened governing regulations requiring him to . . . evaluate every

16 medical opinion received" and was legal error).  Since the ALJ articulated no reasons for rejecting Dr.

17 Gregg's report and also erred in evaluating other treating and nonexamining source opinions, the record

18 does not permit the inference that the ALJ's error was "nonprejudicial" to plaintiff and "irrelevant to [the

19 ALJ's] nondisability finding." See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055-1056 (9th Cir.

20 2006). Accordingly, the error was not harmless.

21         **Lay witness testimony**

22     Plaintiff contends that the ALJ erred in ignoring a "Third Party Function Report" completed by Katy

23 King, plaintiff's County Behavioral Health case manager. Among other things, Ms. King commented on

24 plaintiff's often disheveled appearance, tendency to become distraught, inability to handle stress, and

25 problems with concentration, memory, and following instructions. [JS 12-15; AR 183-190].

26     While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ

27 may discount that testimony by providing "reasons that are germane to each witness." Greger v. Barnhart,

28 464 F.3d 968, 972 (9th Cir. 2006)(quoting Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993)). The ALJ

1  erred in failing to mention, or give reasons for rejecting, Ms. King's lay witness statements. The court

2  cannot conclude that the ALJ's error was harmless when he articulated no basis for rejecting Ms. King's

3  report, which corroborated some of the observations made by plaintiff's treating sources. See Stout, 454

4  F.3d at 1054-1056 (holding that the ALJ's silent disregard of lay testimony was not harmless error because

5  "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony," the court

6  "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision,"

7  and the ALJ's error was not nonprejudicial or irrelevant to the nondisability finding).

8  **Plaintiff's obesity**

9  Plaintiff's sole contention with respect to the ALJ's physical RFC finding is that the ALJ erred in

10  failing adequately to consider the effects of her obesity. [JS 15-20].

11  The ALJ has a duty to determine the effect of a disability claimant's "obesity upon her other

12  impairments, and its effect on her ability to work and general health," even where the claimant's obesity was

13  not independently "severe" and was not explicitly alleged to be a "disabling factor." Celaya v. Halter, 332

14  F.3d 1177, 1182 (9th Cir. 2003)(reversing and remanding the Commissioner's decision that the claimant

15  could perform light work for a "multiple impairment analysis that explicitly accounts for the direct and

16  marginal effects of the plaintiff's obesity during the period in question and that culminates in reviewable,

17  on-the-record findings").

18  In February 2007, plaintiff's weight was measured at 186 pounds and her height was 64 1/2 inches.

19  Using a calculator provided on the Centers for Disease Control and Prevention website, plaintiff had a Body

20  Mass Index of 31.4, which is considered obese but not extremely so.[5]

21  Unlike the claimant in Celaya, plaintiff was represented by counsel during the hearing [AR 23], and

22  the ALJ did not ignore plaintiff's obesity. Instead, he found that it constituted a severe physical impairment,

23  along with moderate to marked right foot osteoarthritis,"compensated hypothyroidism, " and a history of

24  generalized joint pain. [AR 8].  The ALJ adequately took into account October 2006 x-rays showing

25  moderate to severe osteoarthritis of the right midfoot, moderate bunion deformity, and spurs of the third and

26  fourth metatarsal shafts. [AR 297, 412].  He also noted that while plaintiff complained of foot pain, she also

27

28  [5]  See http://www.cdc.gov/healthyweight/assessing/bmi/ (last visited Sept. 8, 2010).

1  testified that she cleaned house, shopped for and cared for an elderly man, and cleaned her daughter's trailer.

2  [See AR 11]. The ALJ noted that aside from evidence of arthritis in the right foot, there were no clinical

3  findings or diagnostic test results related to her complaints of generalized joint pain. [AR 8].  He noted that

4  the consultative examiner found no disturbance in gait or station and no need for an assistive device in

5  February 2007.  The consultative examiner found no physical abnormalities to support plaintiff's complaints

6  of joint pain.  He noted that plaintiff took thyroid medication and saw her doctor regularly for thyroid

7  function monitoring.  [See AR 8, 354-358].

8  Plaintiff has not pointed to any evidence of record supporting her contention that she had obesity-

9  related functional limitations that were overlooked by the ALJ.  Therefore, her contentions lack merit.

10  **Vocational expert's testimony**

11  Plaintiff contends that the vocational expert's testimony does not constitute substantial evidence

12  supporting the ALJ's nondisability determination because: (1) the ALJ's hypothetical question to the

13  vocational expert failed to incorporate the limitations assessed by Dr. Devera or the nonexamining state

14  agency physician [JS 19-23]; and (2) plaintiff cannot perform the mental demands of the jobs identified by

15  the ALJ based on the vocational expert's testimony. [JS 23-28].

16  Hypothetical questions posed to the vocational expert must accurately describe all of the limitations

17  and restrictions of the claimant that are supported by substantial evidence in the record.  Robbins, 466 F.3d

18  at 886; Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). For the reasons described above, the ALJ did

19  not properly assess the medical evidence relevant to plaintiff's mental impairments or the lay witness

20  testimony.  Therefore, the ALJ's RFC finding and his hypothetical question do not describe all of the

21  limitations and restrictions that were supported by the record.

22  At step five of the sequential evaluation, the ALJ must identify alternative jobs that are within the

23  claimant's RFC. See 20 C.F.R. §§ 404.1520, 416.920;  Tackett, 180 F.3d at 1098-1099.  For the reasons

24  already described, the ALJ committed legal error in assessing plaintiff's RFC, and some parts of his RFC

25  finding lack substantial support in the record.  Therefore, the ALJ's step-five finding cannot stand.

26  ///

27  **Remedy**

28  The choice whether to reverse and remand for further administrative proceedings, or to reverse and

9

1  simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th

2  Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of

3  benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038

4  (2000). The Ninth Circuit has adopted the following test, known as the "Smolen test," to determine whether

5  evidence should be credited and the case remanded for an award of benefits:

6      (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2)

7      there are no outstanding issues that must be resolved before a determination of disability can

8      be made, and (3) it is clear from the record that the ALJ would be required to find the

9      claimant disabled were such evidence credited.

10  Harman, 211 F.3d at 1178 (quoting Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996)).

11      A remand for further administrative proceedings is the appropriate remedy because it is not clear

12  from the record that plaintiff would be required to find plaintiff disabled if he properly weighed the evidence

13  of record. On remand, the ALJ should give plaintiff the opportunity for a new hearing and issue a new

14  hearing decision with appropriate findings. See Bunnell v. Barnhart, 336 F.3d 1112, 1115-1116 (9th Cir.

15  2003)(remanding for further administrative proceedings where several "outstanding issues" remain to be

16  resolved, including "if she is disabled, the timing and duration of her disability," and whether, according

17  to a vocational expert, there was alternative work the claimant could perform with all of the limitations

18  supported by the record).

19                                        **Conclusion**

20      For the reasons stated above, the Commissioner's decision is not supported by substantial evidence

21  and does not reflect application of the proper legal standards. Accordingly, the Commissioner's decision

22  is **reversed**, and this case is **remanded** to the Commissioner for further administrative proceedings

23  consistent with this memorandum of decision.

24  **IT IS SO ORDERED.**

25  September 15, 2010

26                                        ANDREW J. WISTRICH
                                          United States Magistrate Judge

27

28